Lisa G. Lewallen (013592)
**Lisa G. Lewallen, PLLC**
P O Box 33430
Phoenix, AZ 85067

602.743.6263
602.391.2838 (fax)
lisa@lewallenlaw.com

ATTORNEY FOR PLAINTIFF

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF ARIZONA

**ANNA MARIE BUCKENMAIER**

**Plaintiff,**

CIVIL ACTION NO. _____

**VS.**

**PFIZER INC., Individually and as
Successor-in-Interest to PHARMACIA
& UPJOHN COMPANY**

**Defendant.**

_____

### PLAINTIFF'S ORIGINAL COMPLAINT

COMES NOW Plaintiff Anna Marie Buckenmaier ("Plaintiff"), complaining of Defendant Pfizer, Inc., Individually and as Successor-in-Interest to Pharmacia & Upjohn Company ("Pfizer"), and would respectfully show the Court as follows:

### I.
### INTRODUCTION

1.01    Plaintiff herein is a consumer of hormone replacement therapy drugs, who has been injured as a result.  Plaintiff's case had been pending previously in MDL No. 1507 in the

Eastern District of Arkansas, Western Division; however the presiding judge in MDL No. 1507 has determined that the continued inclusion of Plaintiff's claims in the multidistrict litigation is no longer warranted.  A statement to that effect and that court's order is being filed simultaneously with the filing of this Complaint.

## II.
## JURISDICTION AND VENUE

2.01   Jurisdiction is proper in this court pursuant to 28 USC §1332 for the reason that there is complete diversity of citizenship between Plaintiff and Defendant and the matter in controversy greatly exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

2.02   This court has jurisdiction over the non-resident Defendant because it has done business in the State of Arizona, has committed a tort in whole or in part in the State of Arizona, and has continuing contacts with the State of Arizona.

2.03   Venue of this case is proper in the United States District Court for the District of Arizona because Plaintiff resides within the state, Defendant marketed and sold drugs in the State of Arizona, has committed a tort in whole or in part in the State of Arizona, and has continuing contacts with the State of Arizona.

## III.
## PARTIES

3.01   Anna Marie Buckenmaier is an individual and a resident and citizen of Goodyear, Maricopa County, Arizona.

3.02   Defendant Pfizer is a Delaware corporation, with its principal places of business in New York and Pennsylvania.  Defendant Pfizer may be served pursuant to FRCP 4(d) by sending a copy of the complaint and 2 waiver forms with prepaid return to Alys M. Kremer, 235 E. 42nd Street, Mailstop 235/27/01, New York, NY 10017.

# IV.
# FACTS

### A.    Plaintiff Acquired Breast Cancer after Ingesting Hormone Replacement Drugs

4.01    Anna Marie Buckenmaier is a 67-year old woman who began taking hormone replacement drugs for menopausal symptoms in 1984.  She continued consuming a combination therapy of estrogen and progesterone for more than five (5) years.  In September 1992, Ms. Buckenmaier was diagnosed with ductal breast cancer, with estrogen and progesterone receptors positive.  On October 1, 1992, she had a left mastectomy.  Her prognosis is guarded.  Over the period of her treatment, Ms. Buckenmaier consumed Provera (manufactured by Pfizer) and Estraderm.

### B.    The Creation of A Disease

4.02    In 1942, Ayerst (the predecessor to Wyeth and Wyeth Pharmaceuticals) received approval to manufacture and market Premarin, a conjugated equine estrogen made from the urine of pregnant horses.  Premarin has remained chemically unchanged from 1942 up until this day, and has been marketed as a hormone replacement product to replace the natural human female hormone, estrogen.

4.03    Since 1942, Wyeth (and later other Defendants) has continuously and vigorously promoted its menopausal hormone therapy products using a variety of marketing messages that emphasize the use of these medications for long-term relief of menopause symptoms.  The marketing logo in the early to mid 1970's describes Premarin as a medication to "start her on, keep her on."  Even in the early 1990's, Wyeth continued to market its hormone therapy product as medicines that required continued use – "protection continued only as long as estrogen therapy continued."  Others joined in this marketing and advertising scheme, to a lesser extent.  To distribute this message to both patients and doctors, Defendant has used numerous different marketing methods:

1.    Sponsoring medical journal articles about the benefits of its products, oftentimes with questionable results drawn from doubtful scientific principles;

2.    Sales representatives and "detail persons" calling on and encouraging physicians to prescribe these drugs;

3.    Sponsoring continuing medical education programs to discuss the purported benefits of these products, often without appropriate description of the corresponding risks;

4.    Hiring physicians in the field to speak to other physicians as an effort to market these medicines;

5.    Press releases of audio, written and television advertising;

6.    Direct-to-consumer advertising in addition to physician-directed advertising;

7.    Medical journal and consumer journal advertising materials; and

8.    Sponsoring medical and pseudo medical organizations to provide "approval" or sponsoring support for the use of these products.

4.04    These different message delivery systems were intended to be twofold:  first to create the "disease" of menopause and thereafter to market the "solution" of hormone replacement drugs.

4.05    In 1977, the Food & Drug Administration issued a statement confirming that estrogen therapy should not be used to treat nervousness during menopause, and that there was no scientific support or any representation that estrogen could keep a woman feeling young or keep her skin soft.  By the time of these reports, Premarin was the fifth most frequently prescribed drug in the United States.

4.06    The first truly scientific literature was published in 1975 in *the New England Journal of Medicine*.  Two articles appeared that linked estrogen therapy to a significantly increased risk of women developing endometrial cancer.  Estrogen sales plummeted, and Defendant was in search of a resurrection for its miracle pill.

-4-

4.07   In 1979, that miracle appeared in the form of an article written by Dr. Robert Greenblatt published in the *Journal of Geriatrics Society*.  Dr. Greenblatt proposed that estrogen related uterine cancer could be avoided if progesterone was added to the estrogen regimen.  Immediately, Wyeth and the others began promoting this combination hormone therapy – Premarin with Provera as a hormone therapy combination.  Pfizer, as the manufacturer of Provera, was delighted to join the "bandwagon."

4.08   Once again, Dr. Greenblatt's proposed remedy was bereft of scientific support, and there was no published scientific literature to even discuss the issue until the Women's Health Initiative was begun in the late 1990's.

4.09   By the mid 1990's, various governmental agencies began questioning the appropriateness of advertising estrogen and hormone replacement therapy as "cures" for all these various conditions caused by the "disease" of menopause.  Seeking FDA approval for the use of these different medicines to "cure" these conditions, Defendant Wyeth agreed to participate in and sponsor various studies.

4.10   One of these studies (Heart and Estrogen/Progestin Replacement Study) was conducted in order to confirm that estrogen/progestin combination therapy did in fact reduce the risk of heart disease.  This study began in 1994.  The results of the study were published in 1998, when the investigators reported that hormone therapy did not reduce the rate of coronary heart disease, and in fact dramatically increased the risk of heart disease and heart attack in these women.

4.11   The Defendant immediately began distancing themselves from and minimizing the results of the HERS study.

4.12   The second study, called the Women's Health Initiative, also began in the early 1990's.  This study was conducted by the National Institute of Health, again with support by the Defendant; this study was designed to definitively answer questions about estrogen/progestin therapy's benefits for heart health, osteoporosis and the other menopausal symptoms identified in Defendant's advertising.

4.13    The Women's Health Initiative was intended to run for 15 years; however, the National Institute of Health halted this study prematurely because the risks of taking hormone replacement therapy outweighed any potential benefits.  The study concluded that "overall health risks exceeded benefits from use of combined estrogen plus progestin ..."

**V.**

**CAUSES OF ACTION**

**A.    Negligence**

5.01    Defendant had a duty to exercise reasonable care in the design, testing, study, development, manufacture, promotion, sale, marketing and distribution of its hormone drugs. Defendant had a duty to assure that the products did not cause users to suffer from unreasonably dangerous side effects and serious health problems which were foreseeable to Defendant.  Defendant also had a duty to warn of adverse drug reactions which it knew, or had reason to know, were inherent in the use of its hormone drugs.

5.02    Before Plaintiff ingested these drugs, Defendant knew or should have known that there had been many case reports, adverse event reports and public and private studies in the medical literature associating hormone drugs with a significantly increased risk of breast cancer.  Defendant also knew or should have known that safer alternative medicines existed which would have provided equally efficacious treatment of the symptoms of menopause without any risk of breast cancer.

5.03    Defendant further had the duty to conduct appropriate clinical trials, tests and studies and review available literature to confirm the safety of its hormone drugs, particularly in light of its advertising efforts; to timely warn consumers of the known and foreseeable risks of hormone drugs; and to implement safer alternative delivery methods and/or medications to treat the symptoms of menopause.

5.04    Defendant committed numerous acts of negligence in the design, manufacture, distribution, marketing and sale of its hormone drugs, including, but not limited to:

(1)    Failing to exercise reasonable care in the design, testing, study, development, manufacture, production, sale, marketing and/or distribution of its hormone drugs;

-6-

(2)      Failing to adequately and fully test its drugs to determine the true risks and benefits of consuming its hormone drugs, including the risk of breast cancer and heart disease;

(3)      Failing to properly warn consumers of the actual and reasonably knowable risks of consuming its hormone drugs, including the risk of developing breast cancer;

(4)      Failing to manufacture and distribute a safer delivery system for estrogen/progestin without the corresponding risk of breast cancer; and

(5)      Promoting the use of its hormone drugs in a fraudulent manner, despite evidence of its dangerousness.

5.05     As a proximate result of the Defendant's negligence, Plaintiff contracted breast cancer and has been seriously injured and damaged.  Plaintiff seeks all damages to which she may be justly entitled.

**B.      Negligence Per Se**

5.06     Defendant was negligent per se in its design, manufacture, marketing, distributing and placing into the stream of commerce products which it knew or should have known were not safe.   As a direct, proximate and legal result, Plaintiff has suffered debilitating injuries for which she seeks all rights and remedies to which she is entitled.

5.07     Defendant was negligent per se in its pre- and post-marketing safety surveillance of the hormone drugs, and violated the following regulations:

(1)      The labeling lacked adequate information on the appropriate and safe use of and risks presented by hormone drugs, in violation of 21 C.F.R. § 201.56(a) and (d);

(2)      The labeling lacked adequate and accurate information of the appropriate kind, degree and duration of expected improvement, in violation of 21 C.F.R. § 201.57(c);

(3)      The labeling failed to state that there was a lack of evidence to support the common belief of the safety and efficacy of hormone drugs, in violation of 21 C.F.R. § 201.57(c);

(4)   The labeling failed to add a proper, complete and sufficient warning of the risks presented, in violation of 21 C.F.R. § 201.57(e);

(5)   There was inadequate information for patients regarding the safe and effective uses (and corresponding risks), in violation of 21 C.F.R. § 201.57(f);

(6)   There was inadequate information regarding the special care to be exercised in order for safe and effective use of hormone drugs, in violation of 21 C.F.R. § 201.57(f);

(7)   The labeling was not accurate, and instead was false, misleading and misrepresented the benefits of the hormone drugs, in violation of 21 C.F.R. § 201.56(b).

5.08   These and other violations of the Code of Federal Regulations are necessarily incorporated into violations of the United States Code and the Arizona Health & Safety Code, all of which were a proximate and producing cause of the injuries and damages suffered by Plaintiff.

**C.   Gross Negligence/Malice**

5.09   The actions of Defendant were more than momentary thoughtlessness, error or inadvertence.   In fact, Defendant acted knowingly and/or with reckless and conscious disregard for the rights, safety and welfare of the Plaintiff.   The actions of the Defendant constitute more than mere negligence, and rise to the level of gross negligence/malice. Exemplary or punitive damages are, therefore, appropriate.

**D.   Strict Liability**

5.10   Defendant had a duty to warn Plaintiff of the risks and/or defects that were known and reasonably knowable with respect to hormone drugs.   Defendant never appropriately warned Plaintiff (or her physicians) of these risks.   Plaintiff used and consumed the hormone drugs in a foreseeable manner, and as directed by Defendant.

5.11   The hormone drugs ingested by Plaintiff were defective and unreasonably dangerous when Defendant placed them into the stream of commerce because, among other things, they created an unreasonable risk of breast cancer without a corresponding benefit.

5.12   The hormone drugs were defective because they were not accompanied by proper, appropriate and adequate warnings of the significance and degree of the known and reasonably knowable risks.  In addition, the warnings given to Plaintiff (and her physicians) did not accurately reflect the scope and severity of the risks and possible side effects.

5.13   Plaintiff's consumption of hormone drugs as directed by Defendant involved a substantial danger that Plaintiff would contract breast cancer.  This substantial danger was not readily recognizable to an ordinary consumer.  Given the knowledge of Defendant when it manufactured, marketed and distributed hormone drugs, and its knowledge before Plaintiff began consuming hormone drugs, Defendant failed to adequately warn of the dangers involved.

5.14   As a direct, proximate and producing result of Defendant's failure to warn of the dangers, Plaintiff suffered debilitating injuries.

5.15   Defendant is liable under the theory of strict product liability as set forth in the Restatement (Second) of Torts.  Defendant was at all times materially engaged in the business of designing, manufacturing, distributing, selling, marketing and advertising the hormone drugs in question.  The hormone drugs in question reached Plaintiff without any substantial change in the condition in which they were sold.

**E.   Misrepresentation and Fraud**

5.16   Defendant, through its advertising, labeling, marketing, sales and detail persons, made significant misrepresentations to the public and to physicians, both about the safety and efficacy of its hormone drugs.  Physicians and their patients, including the Plaintiff, justifiably relied upon the misrepresentations by Defendant and Plaintiff was harmed as a result.  Plaintiff is entitled to recover damages for her injuries caused by Defendant's misrepresentations pursuant to the Restatement (Second) of Torts, § 402(B).

5.17   Additionally, the representations made by Defendant were intentional, and Defendant knew or should have known that the representations made were false and misleading.  Defendant did nothing to correct or properly educate or instruct physicians or

1   their patients, and Defendant failed to warn and failed to report the incidences of serious side

2   effects associated with the drugs used.

3      5.18    As a result of this fraudulent conduct and these misrepresentations, Plaintiff was

4   harmed.  Plaintiff is entitled to recover her actual damages suffered as a result of these

5   misrepresentations and fraud.  Further, because the Defendant's conduct was willful, reckless,

6   intentional and maliciously fraudulent, Plaintiff is entitled to an award of exemplary damages.

7      5.19    As a further result of this fraudulent conduct and these misrepresentations, the

8   FDA and the Federal Government were never provided with a true understanding of the

9   dangers presented by these drugs.

10     **F.     Breach of Warranties**

11     5.20    Defendant designed, tested, manufactured, sold, distributed, marketed and

12   promoted that its hormone drugs were safe and efficacious for their intended uses.  The

13   hormone drugs consumed by Plaintiff reached her without substantial change in their

14   condition, and were used by Plaintiff as intended by Defendant.  Defendant expressly and

15   impliedly warranted that the hormone drugs were not unreasonably dangerous and instead

16   were merchantable and fit for their intended use by Plaintiff.  Further, Defendant expressly

17   and impliedly warranted that the drugs had been fully and adequately tested for long-term use

18   and were safe to use to treat the symptoms associated with menopause.

19     5.21    Defendant breached these warranties (both express and implied) as the hormone

20   drugs were not merchantable, were unfit for their intended use and were unreasonably

21   dangerous when comparing the benefits of the hormone drugs to the risks associated with their

22   use.  Plaintiff was injured as a result of these breaches of warranties.

23

24

25

26

27

28

## VI.

## DAMAGES

6.01    The conduct of Defendant as specifically identified above with respect to Plaintiff was a proximate and producing cause of substantial and permanent injuries and damages to Plaintiff.  As a result of this conduct by Defendant, Plaintiff suffered severe and permanent physical, mental and emotional injuries.  Plaintiff seeks all damages to which Plaintiff is entitled, both at law and in equity, from the Defendant.  Plaintiff seeks recovery for past and future medical expenses, lost wages and lost earning capacity, physical pain and mental anguish, disfigurement and physical impairment.  Plaintiff also seeks attorneys' fees and expenses incurred in litigating this cause of action, along with exemplary damages.

6.02    Plaintiff hereby requests a jury trial.

**FOR THESE REASONS**, Plaintiff requests that the Defendant be cited to answer and appear, and that upon final trial Plaintiff have judgment against the Defendant for Plaintiff's damages as set forth above, for attorneys' fees and expenses, for exemplary damages, for pre- and post-judgment interest at the maximum rate allowed by law, for costs of court, and for such other and further relief to which the Plaintiff may be justly entitled.

RESPECTFULLY SUBMITTED this 14th day of December, 2010.

/s/ Lisa G. Lewallen
Lisa G. Lewallen
Arizona State Bar No. 013592
Lisa G. Lewallen, PLLC
P O Box 33430
Phoenix, AZ 85067

602.743.6263
602.391.2838 (fax)
lisa@lewallenlaw.com

**ATTORNEY FOR PLAINTIFF**